UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------ x
                                        :
KYLE S. RALEIGH,                        :          CASE NO. 3:22-CV-01069 (VDO)
        Plaintiff,                      :
V.                                      :
                                        :
DONNA M BARIBAULT,                      :
MICHAEL DURVIN,                         :
        Defendants,                     :          DATE: October 18, 2024
                                        :
------------------------------------------------------ x
```

## OMNIBUS RULING ON PLAINTIFF'S MOTIONS TO COMPEL

This action concerns Plaintiff Kyle Raleigh's home in Canterbury, Connecticut, which he alleges was "gutted" by Defendants Donna Baribault and her romantic partner, Michael Durvin, after title passed from Baribault to Wilmington Savings Fund Society, FSB ("Wilmington"). Presently pending before the Court are three motions to compel, all brought by the plaintiff, (Doc. Nos. 181, 182, & 194).[1]

In the first motion, the plaintiff moves to compel forensic examination of the defendants' electronically stored information ("ESI").  (Doc. No. 181).  The plaintiff requests the following specific relief: (1) the appointment of a neutral expert to examine the ESI; (2) an order for the defendants to turn over all electronic devices to said expert and to provide all necessary log-in information; (3) an order for Defendant Michael P. Durvin to "cooperate with the plaintiff and police in arranging to have [his iPhone 11] imaged," to the extent the device is still in police custody; (4) an order for Defendant Donna Baribault to "cooperate with the plaintiff and her employer in arranging to have [her work computer] imaged"; and (5) all associated costs to be paid by the defendants.  (Id.).

---

[1] The Court will issue a separate order addressing the defendant's Motion to Compel (Doc. No. 219).

For the second motion, the plaintiff moves to compel his entry onto the defendants' residential property in Rhode Island ("Rhode Island Property") so that he may inspect their fixtures "for the purpose of identifying and photographing any historic materials in their possession." (Doc. No. 182). The plaintiff also seeks an order for the defendants to (a) produce items that he believes are in the defendants' possession but remain unaccounted, and (b) disclose the location of fixtures and chattels they are storing outside of their residential property and permit entry.

The third motion to compel concerns two subpoenas that the plaintiff served on Baribault's employer, Citizens Bank, N.A. (Doc. No. 194). The plaintiff served a subpoena to preserve certain ESI and a subpoena *duces tecum* to produce, in relevant part, (1) photographs and videos on any Baribault-issued device and (2) documents and communications containing the word, "Canterbury." The plaintiff requests that the Court order a forensic examination for responsive ESI.

For the following reasons, all motions are **DENIED** with one exception: the plaintiff's Motion to Compel ESI (Doc. No. 181) is **GRANTED** for the limited purpose of Robert Fitzpatrick conducting a forensics examination of cloud data for the period of time from December 12, 2018 through March 22, 2019.

## I.   <u>BACKGROUND</u>

The facts of this case are straightforward. In short, the plaintiff purchased a foreclosed property and contends that the defendants, the former property owner and her romantic partner, removed fixtures after title passed to the bank but before the plaintiff purchased the property.

Unlike the facts, the procedural history and discovery process are complicated. On August 24, 2023, the plaintiff brought this action in federal court based on diversity jurisdiction. (Doc. No. 1). Discovery formally began in February 2023. (*See* Doc. Nos. 46, 47). The discovery issues

that have been brought before this Court are myriad. The below Background is summarized as follows: (A) the Factual Background is based on the pleadings and attached documents or state court matters referenced in the pleadings; (B) the Discovery Background is based on relevant motions and exhibits establishing the discovery process in this case; (C) the Motions Bearing On Discovery section is based on briefing and attached exhibits; and (D) the Relevant Evidence Connected To Discovery Motions includes evidence that bears on the discovery issues before this Court. The Court notes that the discussion is limited to the discovery filed on the docket.

A. **Factual Background**

On March 19, 2007, Donna and Peter Baribault purchased a house in Canterbury, Connecticut ("Property").[2] (Doc. No. 57 ¶ 10; Doc. No. 55-2 (Second Am. Compl. Ex. B, Mortgage Deed)). Donna Baribault defaulted on her mortgage loan, and the Connecticut Superior Court entered a judgment of foreclosure by sale on January 8, 2018. *See Bank of Am., N.A. v. Baribault et al.*, Case No. WWM-CV17-6012261-S ("*Foreclosure Action*"), Doc. No. 108.10 (Order). On October 22, 2018, the court entered a judgment of strict foreclosure, finding the debt to be $285,760.53 and the fair market value to be $300,000. *See Foreclosure Action*, Doc. Nos. 125.10 (Order) & 136.00 (Notice of Compliance).

On December 12, 2018, title to the Property passed to Wilmington as the trustee. (Doc. No. 57 ¶ 10). The plaintiff alleges that Baribault remained on the premises for three months. (Doc. No. 55 ¶ 14). While Baribault leaves the plaintiff to his proof, she admits that she entered into an Occupant Move-Out Agreement and Release ("Move-Out Agreement") with Selene Finance LP on February 28, 2019. (Doc. No. 57 ¶ 52). The plaintiff attached the Move-Out Agreement to his

---

[2] Peter Baribault was initially a named defendant but is no longer a party in this action. (*See* Doc. No. 123). Unless specified, all references to "Baribault" refer to Donna.

amended complaint, (Doc. No. 55-3), which indicates that Baribault agreed to leave the Property on March 8, 2019, in exchange for $4,500.  (*See id.* at 2).

The plaintiff alleges that, during the three months Baribault allegedly remained on the Property she no longer owned, the defendants removed various historic fixtures from the premises. (Doc. No. 55 ¶ 14).  In the second amended complaint, the plaintiff alleges the cost to replace these fixtures exceeds $50,000; the cost to repair physical damage caused by removal is $10,000; and the labor cost is $5,000.  (*See id.* ¶¶ 14–15).  In the plaintiff's reply to the instant motion, he argues the cost to replace the removed fixtures and repair physical damage caused by the removal (plus 10% prejudgment interest) totals more than $550,000.[3]  (*See* Doc. No. 209 at 4).

In July 2019, the plaintiff purchased the Property "as is" from Wilmington for $184,500. (*See* Doc. No. 55 ¶¶ 50, 56; Doc. No. 135-1[4] at Ex. J, Izzo Aff. Ex. C ("As Is" Contract)).  The plaintiff alleges this price was "a reflection of the aforementioned waste."  (Doc. No. 55 ¶ 56).  On August 17, 2022, Wilmington assigned to the plaintiff "all its right, title, and interest in all causes of action arising out of the removal of any fixtures and/or personal property from the premises, including, but not limited to, claims for statutory theft, conversion, breach of contract, unjust enrichment, replevin, and tortious waste."  (*Id.* (quoting Ex. A, Assignment)).  Five days later, the plaintiff filed the instant action.  (Doc. No. 1).

---

[3] Specifically, the plaintiff states that the cost of replacing unreplevied fixtures and repairing related damage, plus 10% interest, is $498,517.42; and the replacement value of the replevied fixtures is $57,450. (*Id.*).  The plaintiff also seeks treble damages of $1,495.552.26, pursuant to his statutory theft claim.  (*Id.*).

[4] Document 135-1 is an Attachment to the Plaintiff's Second Motion for Prejudgment Remedy, summarized *infra* in subsection C.  The Attachment includes Exhibits A through K and sub-exhibits within Exhibit J. The Court will reference the specific Exhibit and its sub-exhibit when citing to this Attachment, rather than specific pages.  The Court will do the same for all other filings that include multiple exhibits within one document number.

B.    **Discovery Background**

The plaintiff attempted to gather relevant evidence before he filed this case.  On July 1, 2022, the plaintiff spoke with David Izzo, Wilmington's listing agent for the Property, who agreed to send him relevant documents.  (Doc. No. 55 ¶ 49).  On August 4, 2022, Izzo e-mailed "several dozen photos he had taken of the premises during his first inspection on February 28, 2019, as well as several documents."  (*Id.* ¶ 50).  The two agreed to meet in-person later that month, and Izzo promised to keep looking for other relevant documents.  (*Id.*).  Izzo eventually stopped speaking with the plaintiff, and the meeting never took place.  (*Id.* ¶¶ 51–54).

This case was filed in August 2022, and discovery formally began at the end of February 2023.  (*See* Doc. Nos. 46, 47).  In March 2023, the plaintiff subpoenaed several individuals and entities.  On March 2, 2023, the plaintiff subpoenaed Izzo to produce, in summary, all documents concerning the Property and the parties.  (Doc. No. 202-1 at Ex. 2).  He also subpoenaed Verizon Wireless Services ("Verizon"), for Durvin's cell phone data.  (*Id.*).  On March 21, 2023, the plaintiff subpoenaed two entities: (1) Eversource Energy Service Company ("Eversource") for documents concerning Bell Park Realty, Inc.[5] and the Baribaults; and (2) T-Mobile USA, Inc. ("T-Mobile"), for documents concerning Baribault's cell phone data.  (*Id.* at Ex. 3).

On March 15, 2023, Baribault produced her initial disclosures to the plaintiff.  This production included (a) an e-folder entitled, "Izzo, David," containing photographs, audio records, and documents; and (b) miscellaneous documents about the Property, such as listings and agreements.  (Doc. 181-3 at 5–6).

---

[5] Bell Park's predecessor in interest was Loomis Real Estate, Inc., the Baribaults' realtor company.  (Doc. No. 202-1 at Ex. 3 (Attach. to Subpoena to Bell Park)).

On April 5 and 22, 2023, the plaintiff inspected, photographed, measured, and inventoried certain fixtures and goods that the defendants placed on their Rhode Island Property's lawn.  (Doc. No. 105 at 1).

On April 20, 2023, the plaintiff served his first discovery requests on Baribault and Durvin.  (Doc. No. 181-3 at Exs. 5, 6).  For written discovery, the plaintiff requested photographs and videos of fixtures and property that were removed from the Property; communications between the defendants (and Peter Baribault) from March 1, 2018 to the present, listing approximately six pages of specific key words; communications between Wilmington, Selene, Aspen Realty, and/or Izzo from September 14, 2017 to the present concerning the Property; and other miscellaneous documents including, but not limited to, the following subjects: the defendants' purchase and attempted sale of the Property, renovations, and the transportation of fixtures from March 1, 2018 to the present.  (Doc. No. 202-1 at Exs. 4, 5).  The plaintiff also requested to enter and inspect Baribault's Rhode Island Property for purposes of "identifying any and all objects stored therein that had been removed from the [Property]."  (Doc. No. 202-1 at Ex. 5).

On May 19, 2023, both defendants responded to the plaintiff's first discovery requests, indicating that they did not have any documents other than what was already produced.  (Doc. No. 181-3 at Exs. 5, 6).  The parties were not able to agree about an inspection of the Rhode Island Property, which is the subject of the pending Motion to Compel Entry and Inspection (Doc. No. 182).

On July 16, 2023, Aspen produced Izzo's e-mails that were relevant and responsive to the plaintiff's subpoena.  (*See* Doc. No. 55 ¶ 55).

On August 7, 2023, the plaintiff deposed Defendant Durvin.[6]  When the plaintiff asked whether Durvin searched his text message history or e-mails for potentially relevant information, he testified that he did not conduct such a search.  (Doc. No. 181-6 at 213:8–25).  Durvin later submitted a declaration in which he averred that he had a laptop he did not use; a cell phone, which he used to take photographs, send and receive e-mails, and text; a dashcam; and a tablet for watching movies.  (*Id.* ¶¶ 5–11).  He stated that he was arrested in May 2023, his cell phone was seized, and he bought a replacement cell phone where he restored his e-mails, photos, contacts, and other information.  (*Id.* ¶ 12).  To the extent this information was restored from the cloud, he clarified that he did not know his passwords.  (*Id.*).  Lastly, Durvin stated he had "difficulty reading and retaining comprehension due to [his] disability" of post-traumatic stress disorder, attention deficit disorder, anxiety, and depression.  (Doc. No. 202-3 ¶ 4).

Two days later, the plaintiff served discovery requests on and noticed the deposition of Peter Baribault.  (Doc. No. 202-1 at Ex. 8).  The plaintiff sought photographs, videos, and communications about the Property.  Most requests were unlimited in time frame, with the exception of one request for communications extending to 2007.[7]  (*Id.*).

On August 11, 2023, the plaintiff served his "First Interrogatory" on Baribault and Durvin.  (Doc. No. 202-1 at Ex. 9).  Baribault objected and responded on September 9, 2023.  (Doc. No. 182-3).  She generally objected to the discovery request on the grounds that it exceeded the 25-interrogatory limit.  (Doc. No. 182-3 at 1).  Specifically, the defendant argued "Interrogatory 1" contained five questions, 87 separately numbered sub-questions, and four subparts to each sub-question, "bringing the possible number of interrogatories to 1,740."  (*Id.* at 1–2).  Nonetheless,

---

[6] The parties only submitted excerpts of Durvin's deposition.

[7] Baribault was later deposed on October 17, 2023.  (Doc. No. 182-8).

Baribault responded to the First Interrogatory.  For some responses, Baribault conceded that she removed the fixture at some point between March 2018 and March 2019, but she could not remember the exact time.  (*See* Doc. No. 182-3 at 3–4, 68).  For other responses, Baribault confirmed she removed or disposed of the items while she still owned the property.  (*See id.* at 6–22, 24, 31, 34–38, 44–49, 51–67).  And with other items, Baribault either did not recall removing the items, or she affirmatively stated she did not remove them.  (*See id.* at 22–23, 25–31, 38–43, 45–50; 65).

Over the course of two days (October 20 and 23, 2023), the plaintiff deposed Baribault. (Doc. Nos. 182-4, 181-5).  The plaintiff asked questions about specific fixtures, and Baribault often testified that she could not recall the answer.  (*See* Doc. No. 182-4 (excerpts)).  As with Durvin, Baribault submitted a declaration in connection with this briefing.  (Doc. No. 202-2).  Baribault provided some background about her memory: at some point in 2023, she was diagnosed with breast cancer and went through seven months of chemotherapy, radiation therapy, and surgery. (*Id.* ¶ 4).  Her treatment impacted her cognition and memory.  (*Id.*).  In addition, neither Baribault nor her ex-husband kept records of their Property renovations, or items they removed or replaced. (*Id.* ¶ 5).  Baribault stated that, as far as she knew, she had given all items from the Property to the plaintiff pursuant to the PJR Stipulation.  (*Id.* ¶ 12).

On December 15, 2023, the plaintiff served his Second Set of Requests for Production ("Requests") on Baribault.  (Doc. No. 202-1 at Ex. 13).  This second set of requests included 55 Requests and 30 requests for inspection.  (Doc. No. 181-3).  They included detailed requests for the defendant's financial information, court filings concerning unrelated litigation in Rhode Island, the defendant's academic information, and evidence supporting the defendant's deposition

testimony and interrogatory responses. (*Id.*). Baribault responded on February 12, 2024. (Doc. No. 181-3).

On January 3, 2024, the plaintiff served a Second Set of Requests on Durvin. (Doc. No. 202-1 at Ex. 14). He sought (1) "All mortgage deeds executed by you (whether in an individual or representative capacity) during your lifetime"; and (2) "All monthly account statements for your mobile phone for the period of January, 2018, through July, 2019." (*Id.* at 6).

On February 6, 2024, the plaintiff served subpoenas *duces tecum* on ten companies, requiring Baribault's monthly statements for her investment and retirement accounts; checking, savings, and credit card accounts; and call and text records from June 2017 through August 2019.[8] (Doc. No. 202-1 at Ex. 15). Later that month, the plaintiff again subpoenaed Verizon for Durvin's phone data. (*Id.* at Ex. 16).

On March 8, 2024, Baribault supplemented her responses to the plaintiff's First Set of Discovery Requests with photographs, e-mails, and a privilege log.[9] (*Id.* at Ex. 15). She also indicated a forensic examiner collected data from her cell phone using the key words listed in the plaintiff's requests. (*Id.*).

The defendant's forensic examiner, Robert Fitzpatrick, generated his report on April 5, 2024. (Doc. No. 204 at 14). He examined Baribault's phone data that was collected April 20, 2023, and he examined Durvin's phone data collected March 11, 2024. (*See id.* ¶ 5). The report has been submitted into the record. (Doc. No. 220).

On May 6, 2024, the parties entered into a Stipulation regarding the defendant's partial production of cell phone data. (Doc. No. 181-3 at Ex. 18). This Stipulation indicates that both

---

[8] The plaintiff served a similar subpoena on an eleventh company on June 18, 2024. (Doc. No. 202-1 at Ex. 21).

[9] The privilege log lists irrelevant and/or non-responsive photographs with a description of each photograph.

defendants gave their phone to a forensic expert to image their phones and extract data from their Gmail accounts. (*Id.* ¶ 5). The expert then used location data embedded in the multimedia files to identify photographs and videos taken within one mile of the Property and the Rhode Island Property, resulting in thousands of documents. (*Id.* ¶ 7). The parties stipulated to the defendant's production of photographs, e-mails and videos listed in specific paragraphs of the document. (*Id.* ¶ 20).

On May 15, 2024, the plaintiff served a subpoena *duces tecum* on Brian McDonald and Mary Rowan McDonald, potential buyers who lost interest in the Property before its foreclosure, seeking photographs, videos, and notes about the Property. (Doc. No. 202-1 at Ex. 17).

Two days later, the plaintiff served a Second Interrogatory on the defendants. (Doc. No. 202-1 at Ex. 18). This interrogatory requested that the defendants identify all electronic devices used from 2014 through 2019. (*Id.*). The defendants submitted amended objections and responses on May 29, 2024. (Doc. No. 181-3 at Exs. 20, 21). Baribault responded that she used a desktop computer at work, that she had an iPhone 8, and that she previously had other iPhone models that she turned in each time she received a new one. (*Id.* at Ex. 20). Durvin responded that he used a State-owned laptop around 2016 for a re-education program while he was unemployed, but he no longer had it in his possession; he had an iPhone 13 since May 19, 2023; the previous iPhone that he had used for four years was seized by the police on May 19, 2023 and not returned to him; and, prior to that, he had a flip phone. (*Id.* at Ex. 21).

On May 23, 2024, the plaintiff served a subpoena to preserve and produce documents on Citizens Bank, N.A. ("Citizens"), Baribault's employer. (*See* Doc. No. 202-1 at Ex. 19). In summary, the plaintiff requested Citizens preserve Baribault's personal e-mails and documents dating back to November 1, 2006, and all personal photographs and videos. (*Id.*). He also

requested that Citizens produce e-mails between Baribault and specific individuals from November 1, 2006 through March 22, 2019; e-mails between Baribault and Durvin from January 1, 2018 to March 22, 2019; e-mails with the word, "Canterbury" from November 1, 2006 through March 22, 2019; all photographs and videos on Baribault-issued devices; and all documents and communications with the word "Canterbury" on Baribault-issued devices.  (*Id.*)

That same day, the plaintiff also served subpoenas *duces tecum* on three other companies. The plaintiff sought documents, photographs, videos, and communications concerning the Property from Homogenius Real Estate, which uses Pyramid Platform.[10]  (*Id.*).  He also sought from T-Mobile and Verizon (the defendants' phone carriers) all documents and communications concerning each defendant's purchase or lease of any device and participation in a buy-back program from November 2006 to the present.  (*Id.*).

On June 3, 2024, the plaintiff subpoenaed the Warwick Police Department for Durvin's cell phone and ESI.  (Doc. No. 202-1 at Ex. 20).

On June 18, 2024, the plaintiff served another Interrogatory on Baribault.  (*Id.* at Ex. 21). The plaintiff sought detailed information about the "over $200,00[0]-plus" renovation estimates to which Baribault testified during her deposition.  (*Id.* at 2).

In connection with the instant motions, the plaintiff submitted a declaration from Matthew Stippich, the General Counsel and President of Professional Services at Digital Intelligence, Inc. and DIFS, LLC ("Digital Intelligence") who assessed the defendants' ESI given to him by the plaintiff.  (Doc. No. 181-7 ¶¶ 1, 23–28 (signed 8/14/2024)).  First, he indicated that Durvin's

---

[10] According to Pyramid Platform, LLC's website, "Pyramid Platform™ from Radian [Group Inc., the parent company] use[s] task driven workflows to manage residential REO properties, single family rental properties, bulk acquisitions and short sales.  It was designed by users in today's ever changing environment who understand that flexibility is paramount."  *See* PYRAMID PLATFORM, https://pyramidplatform.com/login.aspx?ReturnUrl=%2f (last visited Oct. 18, 2024).

iPhone had been set up to backup content onto the Apple iCloud service but that the defendants did not search the iCloud data.  (*Id.* ¶ 32).  He explained that forensic imaging merely captures the information on the device itself, but not information that has been backed up on the Apple iCloud service, including photographs and text messages.  (*Id.* ¶¶ 33–34).  Second, Stippich described the function of a Portable Case—which facilitates collaboration and evidence sharing but may not always contain actual documents or records—and stated that the defendants' use of a Portable Case created a "data dump" that risked crashing when the plaintiff attempted to access file attachments.  (*Id.* ¶¶ 41–44).  Third, Stippich concluded that Durvin deleted approximately 1,900 photos and videos from March 2 through 10, 2024, *i.e.,* mere days before data from his phone was extracted.  (*Id.* ¶ 54).  Fourth, Stippich observed that nearly all of the text messages between Durvin and Baribault post-date May 22, 2023; which is different from the near-50% of text messages between Durvin and his daughters that pre-date May 2023.  (*Id.* ¶ 62).  He also observed that Baribault did not produce phone and text message data.  (*Id.* ¶ 95).

In response, the defendants submitted a declaration from Fitzpatrick, their forensics expert. For Durvin's phone, Fitzpatrick performed a keyword search of over 230 words, which he averred is the broadest request he has ever received.  (Doc. No. 204 ¶ 11(a) & Forensic Examination Report).  Nonetheless, the plaintiff refused to reduce the terms, as suggested.  (*Id.* ¶ 11(a)).  Absent agreement on the terms, Fitzpatrick decided to narrow the search to 145 keywords, which resulted in 6,552,946 responsive documents.  (*Id.*).  Once discovery was collected, Fitzpatrick offered to provide the plaintiff with his preferred digital format but received no response, so the defendants ultimately produced documents in the following formats: Raw and XML data, HTML, PDF, Excel, PST, KML, and a Pagnet Portable Case.  (*Id.* ¶ 12).  Fitzpatrick examined the most recent iCloud

backups but also indicated, "This examiner is willing to access and extract [iCloud] archives if it pleases the court." (*Id.* ¶ 13).

### C.    <u>Motions Bearing On Discovery</u>

Below, the Court summarizes the prior discovery motions and orders that impact this ruling.

### 1.    **Selene's Motion to Quash (Doc. No. 61)**

The plaintiff has alleged that the Move-Out Agreement was executed between Baribault and Wilmington, with the assistance of Selene Finance LP ("Selene") acting as Wilmington's authorized agent. (Doc. No. 55 ¶ 52). On March 21, 2023, the plaintiff served a subpoena *duces tecum* on Selene, commanding production of "[a]ll records related to the foreclosure and subsequent sale of [the Property] from September, 2017 through July, 2019," by April 4, 2023.[11] (Doc. No. 61-2). Two days later, defense counsel served another subpoena *duces tecum* on Selene, commanding production of various Wilmington-related documents by April 3, 2023. (Doc. No. 61-4).

On April 3, 2023, non-party Selene Finance LP moved to quash subpoenas *duces tecum* served by both parties. (Doc. No. 61). Selene argued that both subpoenas were improperly served and failed to satisfy Rule 45(d)(3) of the Federal Rules of Civil Procedure. (*Id.* at 2–11). The plaintiff responded, agreeing to withdraw his subpoena because he "anticipate[d] being able to obtain the requested information from another source," which he did not name. (Doc. No. 62 at 1). The defendant never responded. (Doc. No. 74). The Court (Meyer, *J.*) then denied as moot the motion as it concerned the plaintiff and granted the motion as it concerned the defendant. (*Id.*).

---

[11] The plaintiff's husband, Matthew Means, personally served the subpoena. (*See* Doc. No. 62 at 1).

## 2.    The Plaintiff's Motions for Prejudgment Remedy (Doc. Nos. 75, 110)

On April 5 and 22, 2023, as part of the discovery process, the plaintiff visited the defendants' Rhode Island Property where he inspected, photographed, and inventoried historic fixtures and other goods.  (Doc. No. 105).

On May 3, 2023, the plaintiff filed a Motion for Prejudgment Remedy ("PJR"), seeking to replevy the items he inventoried during the inspection.  (Doc. No. 75).  The Court (Meyer, *J.*) referred this motion to the undersigned.[12]  (Doc. No. 76).  The Court held a status conference on May 9, 2023, after which it ordered the plaintiff to file a memorandum of law in support of his PJR motion by May 23, 2023; scheduled a follow-up status conference for June 7, 2023; and ordered the defendants to file an opposition by June 23, 2023.  (Doc. No. 83).  Before the defendants filed their opposition, the parties stipulated to a prejudgment remedy of replevin for these fixtures and agreed the plaintiff could enter the defendants' property with a licensed mover and secure the items in the Property's barn until the court ordered otherwise.  (Doc. No. 105 at 2–3).  On June 22, 2023, the Court endorsed the Stipulation and granted the Motion for Prejudgment Remedy.  (Doc. No. 106).

---

[12] On May 6, 2023, the plaintiff filed a Motion for Temporary Restraining Order, which was also referred to the undersigned ("TRO").  (Doc. Nos. 77, 78).  The plaintiff requested a TRO and preliminary injunction "(1) requiring the defendants to return the items at issue back to Ms. Baribault's barn and (2) prohibiting the defendants from removing from the barn any goods or chattels stored therein that originated from the Canterbury premises." (*Id.* at 2).  The Court held a status conference via Zoom on May 9, 2023, wherein the defendants "represented that they would file a notice on the docket by May 12, 2023 indicating whether the property at issue has been moved to a location which will address the concerns raised in the motion." (Doc. No. 83).  The Court canvassed the plaintiff at the conference, and the plaintiff confirmed that such a resolution would address his concerns regarding the integrity of property at issue in the case.  (Doc. No. 85).  On May 12, 2023, the defendants filed a notice confirming they had moved the property, and the Court denied the TRO as moot.  (Doc. No. 84, 85).  Three days later, the plaintiff filed a second TRO motion, which was again referred to the undersigned.  (Doc. Nos. 86, 88).  The defendants objected, (Doc. No. 87), and the Court held a hearing on May 22, 2023, where the defendants represented that all items had been moved into the barn.  (Doc. No. 91).  As agreed by the parties, the Court found the motion moot and ordered the specific items to "remain inside Ms. Baribault's barn and not [be] placed outside on her lawn." (*Id.*).

Less than three months after the Court endorsed the parties' PJR Stipulation, the plaintiff filed a second PJR motion.[13]  (Doc. No. 110).  This time, the plaintiff sought to attach Baribault's interest in her Rhode Island Property along with other assets totaling $627,166.  (*Id.* at 4).  On November 3, 2023, the defendants filed an opposition with exhibits.  (Doc. Nos. 135, 135-1).  Ultimately, the parties entered into another Stipulation, agreeing to limit the attachment value to $300,000 and attaching the Rhode Island Property.  (Doc. No. 155).  The Court endorsed this Stipulation on November 21, 2023.  (Doc. No. 158).

### 3.      Motion for Contempt and Sanctions (Doc. No. 160)

The plaintiff filed a Motion for Contempt and for Sanctions against Baribault and her counsel, respectively.  (Doc. No. 160).  This motion concerned two distinct issues.  First, the plaintiff argued that Baribault failed to replevy all of the fixtures subject to the PJR Stipulation, which was endorsed by a court order.  (*Id.* at 7).  Seven fixtures never materialized.  (*Id.* at 7–10).  Second, the plaintiff argued that defense counsel violated Rule 3.4(6) of the Connecticut Rules of Professional Conduct—which provides that an attorney "shall not . . . [r]equest a person other than a client to refrain from voluntarily giving relevant information to another party"—because he requested that a witness stop speaking with the plaintiff.  (*Id.* at 22).

The defendants opposed the motion.  With respect to the requested contempt, Baribault asserted that she "endeavored to fully comply with her obligation to allow replevy," took every

---

[13] The plaintiff also filed a Motion for Disclosure of Assets and Debts, which the district court referred to the undersigned.  (Doc. Nos. 111, 112).  Specifically, the plaintiff sought to depose both defendants about their property, including bank accounts; money market funds or accounts; real property; stocks, bonds, commercial paper and securities; accounts receivable; motor vehicles, boats and airplanes; and all other tangible and intangible assets valued above $500.  (Doc. No. 111).  After a conference, on October 19, 2023, the Court denied the motion as moot on the ground that the defendants satisfactorily disclosed their assets.  (Doc. No. 125).  In less than a week, the plaintiff filed a second Motion for Disclosure of Assets, and the Court ordered the defendants' response.  (Doc. Nos. 128, 130 & 131).  The parties filed a Joint Response proposing a resolution, and the Court found the second motion as moot and approved the proposal.  (Doc. Nos. 133, 134).

reasonable effort to locate said items, and would have returned them if she had been able to locate

them.  (Doc. No. 167 at 3–4, 6).  As for the sanctions request, counsel conceded that "he could

have chosen his words more carefully" but maintained that Izzo chose not to respond to the plaintiff

for other reasons.  (*Id.* at 10).

On April 4, 2024, the Court (Oliver, *J.*) granted in part and denied in part the Motion for

Contempt and for Sanctions.  (Doc. No. 180).  As to Baribault, the Court denied the plaintiff's

motion for civil contempt on the ground that Baribault diligently attempted to comply with the

court order.  (*See id.* at 7).  The Court made this finding based on the plaintiff's declaration,

Baribault's affidavit, and her deposition testimony.  (*Id.*).  For defense counsel, the Court granted

the plaintiff's request for sanctions on the ground that the attorney violated Rule 3.4(6) when he

informed the witness he would "appreciate it" if the witness refrained from speaking with or

assisting the plaintiff.  (*See id.* at 8).

### D.   Relevant Evidence Connected To Discovery Motions

Discovery is largely closed, save for the pending motions to compel.  (*See* Doc. Nos. 166,

191, 197).  In connection with the myriad discovery motions, the parties filed exhibits that are

relevant to whether the additional discovery that the plaintiff seeks should be compelled.  Though

the Court has reviewed all of the evidence in the record, the Court summarizes only the information

that is relevant to the resolution of the plaintiff's three remaining motions to compel.

According to the plaintiff, the Property is an "eighteenth-century house built by

Revolutionary War captain Asa Bacon," which also includes "two barns, a carriage house, an

outhouse, and a shed."  (Doc. No. 75-2 ¶ 33).  In anticipation of the first PJR hearing, the plaintiff

represented that Zane Claverie—the son of the owner who sold the house to the Baribaults——

would testify that "all of the original doors, hardware, flooring, and woodwork in the house and

outbuildings were intact." (*Id.* at 6).  The plaintiff stated that the Baribaults purchased the house and renovated it, removing some items from the Property and adding others. (*See id.* (citing Doc. No. 68-1 at 2)).

In 2010, Baribault separated from her husband and thereafter attempted to sell the Property and/or refinance the mortgage. (*See id.*; Doc. No. 68-1 at 2).  The plaintiff represented that one of the interested buyers, Brian McDonald, would testify at the PJR hearing that "all of the house's original doors, hardware, and woodwork remained intact" and that "there were numerous, original window sashes stored in the house's attic, as well as a considerable amount of old floorboards, wood, doors, window sashes, shutters, and more stored in the outbuildings." (Doc. No. 93 at 6). McDonald ultimately ceased negotiations in August 2017 after which Bank of America initiated foreclosure proceedings. (*Id.* at 6–7).

Around March 2018, Baribault began to move out of the Property. (Doc. No. 160-3 at 130:9–31:15).  At Baribault's deposition on October 20, 2023, she testified, "I had removed some things that I installed on the property.  You know, modern fixtures, appliances, toilets, a couple of sinks, that kind of thing.  Anything that I was a little bit attached to or liked on the property, I removed." (*Id.* at 132:2–6).  This included some of the historic fixtures alleged in the complaint. (*Id.* at 132:8–11).  There were moments in the deposition when Baribault could not recall the location of a fixture or when she removed it. (*See id.* at 173:6–25; 178:1–20).  Baribault testified that her goal was to remove everything she wanted to remove, including all fixtures, by Thanksgiving 2018. (Doc. No. 182-5 at 324:2–25:19).

According to the plaintiff's declaration, he became interested in purchasing the Property around March 2018. (Doc. No. 75-2 ¶ 6).  He averred that Baribault's listing included a property description and photographs, which "indicated that most of the house's original fixtures—such as

doors, woodwork, and hardware—remained in place." (*Id.*).  The plaintiff submitted an offer in late April 2018, despite not having the opportunity to view the Property.  (*Id.* ¶ 7).  Although the parties briefly e-mailed in July and October 2018, meaningful progress was never made, and the Property's title passed to Wilmington on December 12, 2018.  (*Id.* ¶¶ 7–8).

On December 15, 2018, the plaintiff and his husband visited the Property and took notes about the Property's condition.  (Doc. No. 75-2 ¶ 9).  They walked around the exterior of the property, looked through windows, and looked inside one of the barns.  (*Id.* ¶¶ 9–10).  They determined the Property was substantially similar to the listing photos and contacted Wilmington's realtor to express interest in buying the Property.  (*Id.* ¶ 11).  The plaintiff learned Baribault still occupied the premises.  Around February 2019, the plaintiff and his husband "began driving by the premises more often to monitor the state of the house" and "began to notice suspicious activities at the premises." (*Id.* ¶ 12).

On December 18, 2018, Wilmington's listing agent, David Izzo, visited the Property.  (*See* Doc. No. 135-1 at Ex. J, Izzo Aff. ¶¶ 3, 4(a), 5).  He "posted a Notice on the front door, examined the property, and took a series of exterior photos and tried to make contact with the occupant to advise that the property had gone into foreclosure." (*Id.* ¶ 4(a)).  Izzo drove by on a weekly or bi-weekly basis to "monitor the property for the bank to make sure that there wasn't any damage to the property or maintenance needed." (*Id.* ¶ 4(b)).

Izzo finally got in touch with Baribault and negotiated a cash-for-keys deal with her.  (*Id.* ¶ 4(c)).  Baribault signed the Move-Out Agreement on February 28, 2019.  (*Id.* ¶ 4(d)).

On March 1, 2019, Izzo made his first interior inspection of the Property.  (*Id.* ¶ 4(e)).  He took photographs (and later gave those photographs to defense counsel).  (*Id.*).  Izzo inspected the

Property on March 11 and 22.  (*Id.* ¶ 4(f), (g)).  At the third inspection, Baribault gave Izzo the keys, and he gave her a $4,500 check pursuant to the Move-Out Agreement.  (*Id.*).

On March 18, 2019, Izzo informed the plaintiff through his realtor that Baribault had "gutted the house, and removed all the fixtures."  (Doc. No. 75-2 ¶ 12; Doc. No 135-1 at Ex. D). That same day, Izzo informed colleagues involved in the foreclosure project:

> Attached are photos of the interior of this house.  The occupant left items in the home as well as some debris in the barn (wood, trash, chairs).  The issue we have is that it appears they took some attached items from the home.  The agent noticed a light fixture on the exterior that was removed.  If you look in the photo you will see there are bathroom fixtures and other items missing.  It does appear the home is being remodeled so we are unsure what was there and what was not before CFK was put in place.  They also left a vehicle on the outside of the house.  Given this I am not sure we should hand over the [move-out] check.  If there are a few items left behind that is one thing but the vehicle and potentially stripping items from the home is another.

(*Id.*)

In April 2019, the plaintiff viewed the Property with his realtor.  (Doc. No. 75-2 ¶ 13).  In the plaintiff's declaration, he lists with great detail all of the modern fixtures, historic fixtures, historic materials from outbuildings, doors and hardware that he determined the defendants removed.  (*See id.* ¶¶ 13–16).  The plaintiff also observed electrical cables, water pipes, thermostat lines, and a stone fireplace had been cut and/or smashed.  (*Id.* ¶ 17).

On May 17, 2019, the plaintiff and his husband signed a purchase agreement for the Property, which included an "as is" addendum.  (Doc. No. 135-1 at Ex. J, Izzo Aff. Ex. C).  The closing took place on July 30, 2019.  (*See id.* at Ex. J, Izzo Aff. ¶ 7).

At some point in 2019 after purchasing the Property, the plaintiff spoke with Izzo over the phone.  (Doc. No. 160-2 ¶ 48).  Izzo explained his role with the Property and in negotiating the Move-Out Agreement with Baribault, so the plaintiff identified him as a potential witness.  (*Id.*). Several years went by before the plaintiff spoke with Izzo again.  (*Id.*).

## II.   <u>LEGAL STANDARD</u>

"[T]he scope of discovery is broad." *McCarroll v. Nardozzi*, No. 3:96CV00124 (AVC), 2004 WL 7333640, at *2 (D. Conn. Oct. 13, 2004).  The "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  Considerations must include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.* "The touchstone of Fed. R. Civ. P. 26(b)(1) is relevance," *Compudyne Corp. v. Shane*, 244 F.R.D. 282, 283 (S.D.N.Y. 2007), but it "is not a license for unrestricted discovery." *DiPippa v. Edible Brands, LLC*, No. 3:20CV01434(MPS), 2021 WL 2201194, at *3 (D. Conn. June 1, 2021) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 790 F. Supp. 2d 136, 140 (S.D.N.Y. 2011)).

"When a party files a motion to compel, it bears the initial burden to show the relevance of the information it seeks." *Huseby, LLC v. Bailey*, No. 3:20-cv-00167 (JBA), 2021 WL 3206776, at *6 (D. Conn. July 29, 2021); *Hutchins v. Palmer*, No. CV 12-5927 (JFB) (AKT), 2015 WL 13713335, at * 7 (E.D.N.Y. Mar. 31, 2015) ("[A] party seeking discovery must make a prima facie showing that the discovery sought is more than merely a fishing expedition").  After this burden has been met, the "party resisting discovery [then] bears the burden of showing why discovery should be denied." *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009). "Put differently, the moving party must make 'a *prima facie* showing of relevance,' after which 'it is up to the responding party to justify curtailing discovery.'" *Huseby*, 2021 WL 3206776, at *6

(quoting *Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 48 (E.D.N.Y. 2018)).

"All '[m]otions relative to discovery,' including motions to compel, 'are addressed to the discretion of the court.'" *Mercer v. Rovella*, No. 3:16-CV-329 (CSH), 2022 WL 1514918, at *3 (D. Conn. May 12, 2022) (quoting *Soobzokov v. CBS*, 642 F.2d 28, 30 (2d Cir. 1981)). "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Id.* (quoting *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998)) (internal quotation marks omitted); *see also Dauphinais v. Cunningham*, 395 F. App'x 745, 746-47 (2d Cir. 2010) ("[T]he federal rules give district courts broad discretion to manage the manner in which discovery proceeds, and we review discovery rulings for abuse of discretion." (citations and internal quotation marks omitted)).

## III.    <u>DISCUSSION</u>

Based on the evidence before this Court and representations from the parties, the plaintiff has conducted the vast majority of the discovery in this case. (*See* Doc. No. 202 at 6). The plaintiff subpoenaed realtor companies, the defendants' phone companies, the defendants' banks, and Baribault's employer. He served three sets of interrogatories (which exceed the 25-interrogatory limit if sub-questions are counted), two sets of discovery requests to each defendant, and several requests for inspection. On two occasions, the plaintiff inspected Baribault's premises and ultimately replevied certain fixtures. The plaintiff deposed both defendants, Peter Baribault, David Izzo, and at least two other witnesses. Importantly, because the plaintiff was unhappy with the defendants' initial ESI production, the defendants hired a forensic examiner to extract data so the defendants could produce relevant, responsive documents to the plaintiff's satisfaction.

Discovery is mostly closed (save for the pending motions), but the plaintiff is searching for more.  He believes the defendants have not been forthcoming about the documents in their possession.  This belief forms the basis of the relief he seeks.

A.      **Plaintiff's Motion To Compel A Forensic Examination (Doc. No. 181)**

The plaintiff moves to compel documents responsive to Requests One through Five, Seven through Nine, and Eleven.  (Doc. No. 181-1 at 4).  In short, these Requests seek photographs, videos, documents and communications concerning fixtures and personal items removed from the Property (RFP One through Four, Eleven); communications concerning the foreclosure process (RFP Five); and documents concerning Baribault's purchase, renovations, and sale of the Property (RFP Seven through Nine).  (Doc. No. 181-3 at 5–13).  To facilitate obtaining relevant and responsive documents he believes were improperly withheld, the plaintiff seeks a court order: (1) to appoint a neutral forensic examiner; (2) to compel the defendants to turn over all devices to that expert; (3) to order Durvin to cooperate with the plaintiff and the Warwick Police Department regarding his iPhone 11 that is allegedly in police custody, and (4) to compel Baribault to cooperate with the plaintiff and her employer so her work devices can be imaged and searched.  (Doc. No. 181 at 1).  The plaintiff further requests that the Court order the defendants to pay for this forensic examination.

The plaintiff argues that this discovery is relevant to determining what fixtures and materials were on the Property when Baribault bought it, when these items were removed, whether they remain in the defendants' possession, the defendants' intent when they removed the items, and whether Wilmington waived claims by paying Baribault.  (Doc. No. 181-1 at 4).  The defendants have not objected on relevance grounds.

22

Instead, the parties dispute whether the discovery sought is proportional to the needs of this case.  The Court will address each proportionality factor: "[1] the importance of the issues at stake in the action, [2] the amount in controversy, [3] the parties' relative access to relevant information, [4] the parties' resources, [5] the importance of the discovery in resolving the issues, and [6] whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).

### 1.    Importance Of The Issues At Stake

The defendants describe the issue at stake as the following: "It is critical to Plaintiff's claim that he establish precisely when fixtures were removed as a predicate for proving that the removal violated Wilmington's mortgage covenants or that Wilmington had a cause of action against Donna for their removal. Defendants believe that the extensive discovery to date has not elucidated those facts."  (Doc. No. 202 at 10).  They argue that the plaintiff has already obtained considerable discovery through "less intrusive and less expensive discovery tools and has not discovered the information he firmly believes must exist."  (Doc. No. 202 at 11).

The plaintiff instead characterizes the issue at stake as "related to the preservation of historic structures and the punishment and deterrence of theft."  (Doc. No. 208 at 2 (incorporating Doc. No. 209 part II.A.)).

As the 2015 Committee Note indicates, it is "important to repeat the caution that the monetary stakes are only one factor, to be balanced against other factors."  Fed. R. Civ. P. 26 advisory committee's note, 2015 amendment.  The "significance of the substantive issues" should be "measured in philosophic, social, or institutional terms."  *Id.*  Other important stakes include matters of public policy, "such as employment practices, free speech, and other matters," or that which "vindicate[s] vitally important personal or public values."  *Id.*

One example of a "vitally important" issue to the public is *Walls v. City of New York*, 502 F. Supp. 3d 686, 689 (E.D.N.Y. 2020), a case in which police officers forcibly entered the home of the plaintiff and her minor children.  After entering, the officers occupied and searched the home without the plaintiff's consent for sixteen hours.  *Id.* at 690.  The court explained that the "importance of the issue at stake" is "significant, as they involve civil rights."  Indeed, ensuring the safety of a parent and her children *within their home* is a paramount human rights concern that all people share and are entitled to preserve.

The same cannot be said for the plaintiff's concern for the historic preservation of his home.  While the plaintiff's passion is notable, it concerns his personal property and is unlikely to touch the lives of other community members.  Furthermore, the plaintiff does not acknowledge the fact that he was aware of the premises' conditions before he bought the Property and that the purchase price reflected the fact that historic items had been removed.  With respect to the plaintiff's desire to deter theft, the Connecticut Penal Code exists for this very purpose.  Accordingly, this factor does not warrant the discovery the plaintiff seeks.

### 2.     Amount In Controversy

The parties view the "amount in controversy" differently.  The defendants that argue the subject of the action is a 241-year-old house in disrepair, and that the plaintiff's claimed cost of repair exceeds the purchase price "by several magnitudes."  (Doc. No. 202 at 11–12).  The plaintiff, on the other hand, characterizes the amount in controversy as $1,553,002.26.[14]  (Doc. No. 208 at 4 (incorporating Doc. No. 209 part II.B.)).

---

[14] Specifically, the plaintiff states he seeks $498,552.26 in compensatory damages and $1,495,552.26 in treble damages for statutory theft.  He also explains the replacement value of the replevied antique fixtures totals $57,450.  These calculations do not appear to equal $1,553.002.26.

During the hearing, the Court asked the plaintiff several questions about the measure of damages in this case.  With respect to the Property's market value, the plaintiff stated that the market value was approximately $300,000 *before* the fixtures were removed and that he bought the Property for approximately $184,000.   When prompted, the plaintiff conceded that the difference in property value was approximately $110,000 to $120,000.  He acknowledged that, based on a market value calculation, his damages would be approximately $115,000 in compensatory damages and $350,000 in treble damages (factoring in statutory interest).  Alternatively, the plaintiff argued damages could be measured by replacement value, and he asserted that the estimated replacement value was $300,000.  He also claimed that the defendants' mortgage on the property was about $300,000.

The amount in controversy has not yet been determined.  One possible way to measure damages could be to subtract the plaintiff's purchase price (*i.e.*, the price after the fixtures were removed) from the fair market value at the time of foreclosure.  During the hearing, the plaintiff argued that the fixture replacement value should be used to calculate damages.  Baribault's interrogatory responses indicate that most, if not all, items were removed while she still owned the home.  Based on the information provided about the difference in the Property's fair market value at the time of foreclosure and at the time of sale to the plaintiff, the judgment of strict foreclosure (finding the debt to be $285,760.53 and the fair market value to be $300,000), the evidence before the Court (*i.e.,* Baribault's interrogatory responses approximating dates when items were removed), the absence of documentary proof about specific dates when items were removed, and the extensive discovery that has already been conducted, the Court finds that the amount in controversy does not justify the additional discovery sought by the plaintiff.

### 3.   Parties' Relative Access To Relevant Information

The parties appear to agree about the third factor insofar as the defendants tacitly admit they are the likeliest custodians of the sought-after discovery, and the plaintiff contends there is "information asymmetry" between the parties.  (Doc. No. 202 at 12; Doc. No. 208 at 5–6).  Instead, the defendants state the plaintiff refused to negotiate search terms that would narrow the ESI to a reasonable volume.

The Committee Note on the 2015 Amendment to Federal Rule 26 states:

> Some cases involve what often is called "information asymmetry." One party--often an individual plaintiff--may have very little discoverable information. The other party may have vast amounts of information, including information that can be readily retrieved and information that is more difficult to retrieve. In practice these circumstances often mean that the burden of responding to discovery lies heavier on the party who has more information, and properly so.

Fed. R. Civ. P. 26 advisory committee's note, 2015 amendment.

There is evidence in the record suggesting that photographs were taken in November 2018, one month before Wilmington took title to the Property.  (*See* Doc. No. 160-2 at 97 (Izzo: "The property was fully furnished back in November 2018 when it was listed by another agent….")).  While Izzo photographed the Property's exterior in December 2018, he was not able to photograph the interior while Baribault remained on the premises.  (*Id.* at 96–97).  Nor is there evidence in the record to suggest anyone else entered the Property once Wilmington obtained title.  Because it appears the defendants were the only individuals with access to the Property from December 12, 2018, through March 22, 2019, they are the likeliest sources of evidence establishing what items, if any, they removed.

That being said, the "information asymmetry" is not as straightforward here as it is in most cases.  The Court finds *Hutchins v. Palmer* instructive.  There, a husband and wife sued two individuals and their wealth management company for defrauding them out of $160,000.

26

*Hutchins*, 2015 WL 13713335, at *1.   In relevant part, the plaintiffs moved to compel ESI controlled by the individual defendants and for a court order endorsing their ESI protocol.   *Id.* They argued that the defendants conducted their work on computers and communicated through e-mail.   *Id.* at *8.   The defendants refused to provide responsive ESI, maintaining that the plaintiffs "can propose whatever methodology he wishes concerning electronically stored information to me, as we do not have any ESI to exchange."   *Id.*   The parties met-and-conferred, and the plaintiffs offered to pay for a forensic analysis, "unless the examiner finds discoverable matter, in which case the cost shall be borne by Defendants."   *Id.* at *9.   The defendants rejected this proposal, reiterating that they had already produced all e-mails in their possession.   *Id.* at *9–10.   The Court stated, "Having reviewed the parties' arguments concerning Defendants' ESI production as well as the evidentiary submissions attached to the motion papers, the Court finds that Defendants have not fully complied with their ESI preservation and production obligations."   *Id.* at *10.   The Court expressed concern about "Defendants' inconsistent representations concerning discovery," and "conclude[d] that there has not been a thorough vetting by the Defendants of the ESI in this case." *Id.* at *12.   For these reasons, the Court granted the plaintiff's request for a forensic examination, subject to the plaintiff's cost-shifting proposal.   *Id.*

    As with the *Hutchins* defendants, the plaintiff has identified certain concerns with respect to the defendants' ability to adequately search their devices and produce responsive ESI with their counsel's assistance.   (*See* Doc. No. 181-1 at 3–4, 6–15).   In contrast, the defendants have already turned over their devices for forensic examination *and paid for that examination*.   Perhaps acknowledging their previous deficiencies with respect to ESI, the defendants in this case agreed to the result that the *Hutchins* plaintiffs could only achieve through motion practice.   In other words, their cooperation to date reflects their acknowledgment of such "information asymmetry,"

and they have already attempted to provide the plaintiff with the discovery he seeks, to the extent it exists.  The Court finds that, while "information asymmetry" certainly exists in this case, the defendants' cooperation to date reduces the need for such a sweeping *second* forensics examination.

### 4.    Parties' Resources

Fourth, the parties disagree about the defendants' financial resources.  Defense counsel describes both defendants as having "modest means," insofar as Baribault is a divorced, single bank branch manager whose home is encumbered through this lawsuit, and Durvin is an RV mechanic.  (Doc. No. 202 at 12).  Counsel estimated that the defendants' legal fees to date exceed $300,000 and represented that "this action is rapidly bankrupting" Baribault.  (*Id.*).

The plaintiff believes that the defendants have more assets than they indicate.  (*Id.* at 6).  With respect to Baribault, he argues that she has an annual salary of $98,000; "she undoubtedly must also have access to significant amounts of cash, given her claim to have spent 'well into the low six figures range' on legal fees and costs"; her only liability is a $210,000 mortgage where her son lives "and should be paying her rent."  (Doc. No. 208 at 6).  As for Durvin, the plaintiff argues the $270,000 proceeds from selling his home should be considered in addition to his $15,000 annual salary.  (*Id.*).

The Court concludes that the defendants are of "modest means."  The plaintiff appears to believe that Baribault has significant savings that she is hiding, because she has spent so much money defending herself in this litigation.  But he does not appear to appreciate that Baribault may be facing bankruptcy because she is spending her life savings on this litigation.  The same can be said of Durvin, given that his annual salary is $15,000.  The Court finds that the defendants'

resources weigh against ordering additional discovery, especially if this discovery involves an expensive forensic examination that the plaintiff wants the defendants to pay for.

### 5.    Importance of Discovery In Resolving The Issues

The defendants argue that there has already been sufficient discovery "to satisfy Plaintiff's reasonable needs" and that "[n]ot having discovered any evidence to support those allegations, Plaintiff should desist."  (Doc. No. 202 at 12–13).  Furthermore, the defendants contend that the plaintiff's only basis for warranting additional discovery is the defendants' lack of memory and Baribault's failure to keep records of past renovations—these reasons, according to the defendants, are irrational and insufficient.  (*Id.* at 13).  Defense counsel adds: "At some point, discovery reaches the point of diminishing returns and relentlessly pursuing it becomes abusive.  Defendants believe that this case reached that point some time ago."  (*Id.*).

The plaintiff maintains that the discovery sought is central to the case.  He posits that responsive documents *may* help him determine when certain fixtures were removed, whether the defendants have remaining fixtures in their possession, and the defendants' intent.  (Doc. No. 208 at 7).

Based on the evidence in the record, it appears that the plaintiff has not established exactly which items, if any, were removed by the defendants *after* Baribault lost title to the Property.  Indeed, Baribault has provided a fulsome response to the plaintiff's First Interrogatory that explains her best recollection of when she removed each of the listed fixtures.  (Doc. No. 182-3).  Baribault's answers are not boilerplate responses, as she varied her answers according to her best recollection about whether the specific item was removed and, if so, when.  Answers include but are not limited to: "SOMETIME DURING THE PERIOD MARCH 2018 TO MARCH 2019," (*Id.* at 3); "MARCH 2018 TO NOVEMBER 2018," (*id.* at 6); "DURING THE PERIOD MAY TO

NOVEMBER 2018," (*id.* at 9); "I DON'T RECALL" or "I DON'T KNOW," (*id.* at 23, 26); "I AM UNSURE BUT ASSUME THAT IT WOULD HAVE BEEN SOME TIME DURING THE PERIOD 2007-17," (*id.* at 34); "2018," (*id.* at 49); "DURING THE PERIOD 2007 TO 2017," (*id.* at 52); "ON OR ABOUT JULY 12, 2018," (*id.* at 59).

The plaintiff is not satisfied with these interrogatory responses.  However, "the standard for the production of ESI is not perfection."  *Chen-Oster v. Goldman, Sachs & Co*., 285 F.R.D. 294, 306 (S.D.N.Y. 2012).  It is true that one way the plaintiff could establish whether fixtures were removed between December 12, 2018, and March 22, 2019, is if the defendants took contemporaneous photographs of, or communicated about, the items they allegedly removed.  In other words, such documents (if they exist) are undoubtedly important to resolving the dispute. But these documents would comprise only a small fraction of the ESI the plaintiff seeks.  Apart from the expansive time period suggested by the plaintiff, the vast majority of the ESI the plaintiff would like to search would likely not contain the information relevant to his claims.  To the extent the plaintiff is seeking documents that establish intent, he may rely on the extensive discovery he has already conducted.

### 6.    Burden or Expense Versus The Likely Benefit

Lastly, the parties disagree as to whether the burden and expense outweighs the likely benefits.

The defendants argue that "[t]he breathtaking scope and breadth of Plaintiff's discovery request, the cost of which has been borne by Defendants, is more akin to the type of request that one would find in commercial or other litigation involving sophisticated entities, with many employees or participants, involving enterprises where computers are a necessary tool." (Doc. No. 202 at 13).  Describing the defendants as "unsophisticated," counsel posits that doing another

forensic examination on their devices will be expensive and is unlikely to lead to probative evidence. (*Id.* at 14). Nonetheless, the defendants do offer some sort of a compromise: "The goal is to find evidence that Donna removed fixtures, without Wilmington's permission during the period December 12, 2018 to March 22, 2019—the period that Wilmington first owned the premises to the day Donna last left it. If the request for production were limited to that period, Donna wouldn't object if Plaintiff indulged himself at his expense." (*Id.* at 15).

The plaintiff points out that the defendants now admit to possessing more electronic devices than they originally disclosed. (Doc. No. 208 at 9). He also maintains that the scope of the original forensic analysis was improperly inflated due to the forensic examiner's misreading of the plaintiff's discovery request. (*Id.* at 8).

But the plaintiff has not presented any evidence that an additional forensic examination would lead to responsive discovery that he does not already have. Indeed, there is no evidence that photographs were taken of the Property from December 12, 2018 through March 22, 2019.

As the committee note to the 2006 amendment of Rule 34(a) states, permitting a party to test and sample ESI "is not meant to create a routine right of direct access to a party's electronic information system, although such access might be justified in some circumstances." Fed. R. Civ. P. 34 advisory committee note, 2006 amendment. "Courts should guard against undue intrusiveness resulting from inspecting or testing such systems." *Id.* This is particularly true where the plaintiff's main arguments for requesting a second forensic examination are that (1) he does not believe the defendants' representations (*i.e.*, that they do not possess relevant documents) and (2) some of Baribault's discovery responses are inconsistent. (Doc. No. 181-1 at 8–10); *see Carling v. Peters*, No. 10-cv-4573, 2011 WL 3678839, at *4 (S.D.N.Y. Aug. 19, 2011) ("Other than speculation . . . [the defendant] offers no evidence that [the plaintiff] possesses [the requested]

documents."); *Moll v. Telesector Res. Grp., Inc.*, No. 04-cv-805S, 2010 WL 4642931, at *3 (W.D.N.Y. Nov. 17, 2010), *vacated in part*, 760 F.3d 198 (2d Cir. 2014) (denying the plaintiff's motion to compel despite the argument that "there must have been" responsive documents, relying on the defendant's representation that a reasonable search found no responsive documents); *Stewart v. First Transit, Inc.*, No. Civ. No. 18-3768, 2019 WL 13027112, at *2 (E.D. Pa. Sept. 3, 2019) ("Generally, mere skepticism that an opposing party has not produced all relevant information is not sufficient to warrant a forensic examination." (internal quotations omitted)). Based on the evidence before this Court, the burden placed on the defendants and the expense of starting from scratch another forensics examination *with a new expert* is far outweighed by the relatively low likelihood of discovering relevant evidence.

### 7. Conclusion About The Plaintiff's Request For Another Forensic Examination

While the discovery standard is broad, "this does not mean that a party must automatically produce any document that catches its adversary's fancy." *Scricca v. Boppy Co.,* LLC, No. 3:22-CV-01497 (RNC), 2024 WL 1211061, at *3 (D. Conn. Mar. 21, 2024). The purpose of proportionality is "to deal with the problem of over-discovery." Fed. R. Civ. P. 26 advisory committee's note, 2015 amendment. According to the 1983 Committee Note (quoted with approval in the 2015 amendment): "The objective is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry. The new sentence is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse." *Id.* When it comes to ESI, "[f]orensic examinations of computers and cell phones are generally considered a drastic discovery measure because of their intrusive nature." *Stewart*, 2019 WL 13027112, at *1;

*Aminov v. Berkshire Hathaway Guard Ins. Co.*, No. 21-CV-479-DG-SJB, 2022 818944, at *1

(E.D.N.Y. Mar. 3, 2022) (citing same).

In exercising the Court's discretion to identify and discourage discovery overuse, the Court

finds that the plaintiff's discovery requests are disproportionately broad.  As a general matter, the

defendants have already produced extensive discovery, including a previous forensic examination

that cost approximately $6,000.  Fitzpatrick generated his forensic examination on April 5, 2024

and produced documents to the plaintiff by the end of May 2024, which means the plaintiff had

nearly five months to bring any deficiencies before the Court.  (Doc. No. 181-2 ¶¶ 15–32).  The

plaintiff's decision to wait to file the instant motion until the final weeks of the discovery period

weighs against ordering additional production.

Turning to the Requests, the Court finds that Requests One through Five and Eleven—

which seek photos, videos, communications, and documents concerning fixtures that were

removed—are overly broad because the time frame extends well beyond the period of time when

Baribault did not own the Property but still occupied it (*i.e.*, December 12, 2018 through March

22, 2019).  Furthermore, the Court concludes that the keywords listed in Requests Three through

Five are far too expansive to yield a reasonable volume of responsive discovery.[15]  Requests Seven

through Nine concern a time period in which Baribault still owned the Property, and the Court

finds such discovery is not proportional at this late stage in the litigation.

That being said, the Court finds that a second forensic examination of the defendants' cloud

data from December 12, 2018 through March 22, 2019 is relevant and proportional to the needs of

---

[15] "[T]he best solution in the entire area of electronic discovery is cooperation among counsel." *William A. Gross Constr. Assocs., Inc. v. Am. Mfrs. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009).  Thus, "[i]deally, the parties should agree on the search methods, including search terms or concepts."  *Saliga v. Chemtura Corp.*, No. 3:12-cv-832(RNC), 2013 WL 6182227, at *3 (D. Conn. Nov. 25, 2013).

the case.  First, Fitzpatrick did not image cloud data created from December 12, 2018 through March 22, 2019.  (Doc. No. 202-4 ¶ 13).  Second, Baribault has agreed to another forensic examination as long as it is limited to this time period and the plaintiff incurs the costs.  (*See* Doc. No. 202 at 15).  Third, there is some evidence that Durvin deleted photographs before his phone was imaged, and so a second, targeted forensic examination may lead to discovery that was not initially identified.  (*See* Doc. No. 181-7 ¶ 54).

For these reasons, the Court orders:

- The defendants shall provide Robert Fitzpatrick with their cloud information (or assist Fitzpatrick in obtaining the information);

- Robert Fitzpatrick shall conduct a forensic examination for cloud data between December 12, 2018 and March 22, 2019, using the same methods set forth in his declaration.  The defendants shall assess the data collected in this forensic examination and produce the following, if it exists:

  o The defendants shall produce discovery responsive to Requests One through Five and Eleven, limited by the date range ordered by this Court;

  o For Requests Three, Four, and Five, Fitzpatrick shall use the plaintiff's requested keywords (narrowed by the limited time period).

Having determined what aspect of the Requests are relevant and proportional, the Court now addresses the specific relief the plaintiff seeks.

First, the Court finds that a different, neutral forensics examiner is not warranted.  After reviewing the declarations from Matthew Stippich and Robert Fitzpatrick, the Court is satisfied that Fitzpatrick will adequately perform his duties to image and examine the limited cloud data ordered by the Court.

Second, because the Court is ordering a review of cloud data created during the key time period, the Court concludes it is not necessary for Durvin's iPhone 11 (in police custody) or Baribault's work devices to be examined.[16]   Indeed, the plaintiff has not provided any evidence that such an examination is reasonably likely to lead to evidence during the critical December 12, 2018 through March 22, 2019 time period.  (*See* Doc. Nos. 181-1 at 20–21, 24, 31; 181-2 ¶¶ 34, 40).

Third, the Court finds that the defendants should not bear the burden of the entire cost for this production.  Rule 37 of the Federal Rules of Civil Procedure provides that the court "may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion."  Fed. R. Civ. P. 37(a)(5)(C).  Here, the plaintiff knew that the Property was "gutted" before he bought the house, and he does not appear to have documentary evidence establishing that the fixtures were removed after Baribault lost title to the house.  The defendants have already conducted and paid for an expansive forensic examination and have participated fully in this discovery process beyond what is normally asked for in a case of this size and despite their "modest means."  In exercising its discretion under Rule 37(a)(5)(C), the Court orders the plaintiff and the defendants to split the cost of this additional forensic examination.

**B.** **Plaintiff's Motion To Compel Entry and Inspection Of Defendants' Rhode Island Property (Doc. No. 182)**

The plaintiff moves for entry onto, and inspection of, the defendants' Rhode Island Property.  He argues that the inspection is relevant and proportional to his replevin claim.  First, the plaintiff argues entry and inspection is relevant because the defendants deny possessing a portion of items the plaintiff seeks to replevy.  (Doc. No. 182-1 at 20).  Second, he argues another

---

[16] The plaintiff has not provided the Court with any legal basis to exercise its authority over a potential criminal matter in another state.

inspection is proportional for the following key reason: "The only reasonably available source of evidence regarding the historic materials in the defendants' possession, aside from an inspection, are the defendants themselves.  The defendants' testimony and representations on the subject, however, have proven to be essentially worthless."  (*Id.* at 28).  He also seeks a court order for the defendants to produce specific fixtures, including those located outside the Rhode Island Property. (*Id.* at 30).

The defendants filed only one opposition for the first and second motions to compel (Doc. Nos. 181, 182, 202).[17]  Accordingly, they concede the inspection is relevant but argue it is not proportional for the reasons stated *infra*, at Part III.A.

The plaintiff previously requested to inspect and inventory all fixtures in the defendants' possession.  (Doc. No. 182-1 at 4, 6 (referring to the first and second Requests)).  On April 5 and 22, 2023, the defendants placed fixtures on their Rhode Island Property lawn, and the plaintiff inspected and inventoried them.  (*Id.* at 5–6).  The plaintiff concluded that some fixtures were missing.  (*Id.* at 6).  On April 30, 2023, the plaintiff requested to enter the Rhode Island Property for the purpose of identifying additional fixtures.  (*Id.* at 7).  Baribault objected (and has not changed her position).  (*Id.*).  Thereafter, Baribault located and produced additional items.  (*Id.* at 8–9).  The defendants maintain that Baribault has produced all fixtures in her possession.  (*Id.* at 9).  The plaintiff does not believe them and wants to inspect the Rhode Island Property to look for fixtures with his own eyes.  (*Id.* at 16).  In his memorandum of law, the plaintiff cites numerous excerpts from both defendants' depositions when they testified that they could not recall requested information about certain fixtures, renovations, and the conditions of the Property.  (*See id.* at 21–

---

[17] Perhaps because the defendants used the same opposition for both motions, the plaintiff's replies are similar as well.  Accordingly, the Court will not rehash his arguments either.

27).  In part because the defendants did not answer the plaintiff's questions at their depositions, he believes the only option is to inspect the property himself.  (*Id.* at 28).

On February 4, 2024, the plaintiff moved for contempt against Baribault.  In relevant part, he argued that Baribault should be held in contempt because she failed to replevy all of the historic fixtures covered by the consent order and failed to make reasonable efforts to locate and produce the missing items.  (Doc. No. 160-1 at 7–16).  On April 1, 2024, the Court (Oliver, *J.*) held an evidentiary hearing, at which the plaintiff, his husband, and the defendants all testified.  On April 4, 2024, the Court (Oliver, *J.*) denied the plaintiff's request to hold Baribault in civil contempt. Specifically, the Court ruled that "Baribault made diligent efforts to comply with the consent order, especially since all but seven items on the inventory list have been replevied."  (Doc. No. 180 at 7).  As the Court explained, Baribault was not present for the move, she was notified of the missing fixtures within three days, she searched for the missing items, and she did not find any.  (*Id.*).  In addition, Durvin testified that he assisted Baribault in looking for the missing items.  (*Id.*).

At oral argument on October 9, 2024, the plaintiff explained that one reason he doubted Baribault's answers regarding the locations of the historic fixtures was that he had received photographs in March and May 2024, which appeared to show the presence of some of the items that were not shown to him in April 2023.  (*See* Doc. No. 182-2 ¶¶ 30–36, 41, 47).  Despite having possession of the March 2024 photographs, he never supplemented his briefing to bring the supplemental production to the Court's attention in support of his motion for contempt. He also never sought reconsideration of the Court's April 4, 2024 ruling denying his motion for contempt.

In the Court's view, this most recent motion to compel entry onto the Rhode Island Property is simply an attempt to relitigate the issues already resolved in the April 4, 2024 ruling denying the motion for contempt.  Specifically, after conducting an evidentiary hearing, the Court

held that Baribault acted diligently with respect to her discovery obligation.  The Court has already denied that motion, which is the law of the case, and, in doing so, has credited Baribault's representations about what she did with the fixtures.  *See Arizona v. California*, 460 U.S. 605, 618 (1983) ("Unlike the more precise requirements of res judicata, law of the case is an amorphous concept.  As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

In his motion, the plaintiff acknowledges that courts generally deny a motion to compel when the defendant avers in good faith that the items sought do not exist or are not in the defendant's possession.  (*See* Doc. No. 182-1 at 18–19).  The plaintiff argues that he is entitled to enter and inspect the property, because the photographs produced in March and May 2024 are "specific evidence" (as opposed to mere "suspicion") that additional items exist.  (*Id.* (citing *Margel v. E.G.L. Gem Lab Ltd.*, No. 04 Civ. 1514(PAC)(HBP), 2008 WL 2224288, at *3 (S.D.N.Y. May 29, 2008)).

The Court finds that the photographs do not establish "specific evidence" that unreplevied items remain on the Rhode Island Property. [18]  *Margel*, 2008 WL 2224288, at *3 ("Defendants do not point to any specific evidence suggesting that additional responsive documents exist and have not been produced. Litigants commonly suspect that they are not getting all the documents they have requested and that an adversary is holding something back. That suspicion, however, will not sustain the imposition of sanctions."); *c.f. Lewis v. Doe*, No. 3:19-cv-02015 (JCH), 2021 WL 863473, at *4–6 (D. Conn. Mar. 8, 2021) (finding a document retention policy *and* deposition

---

[18] As the plaintiff acknowledges, the defendants aver they have not disposed of historic materials.  (*See* Doc. No. 182-1 at 30).  The defendant's memory loss about the items' location (as argued by the plaintiff) neither supports nor refutes the allegation that items remain on the Property.  (*See id.* at 21–25).

testimony that materials may still exist constituted sufficient "specific evidence" to establish the documents sought likely remained in the defendant's possession). Supplemental discovery is not evidence that an adversary is holding something back. Quite the contrary: the defendants' supplemental production constitutes evidence responsive to one of the plaintiff's discovery requests and evinces that the defendants properly engaged in their discovery obligations. *See* Fed. R. Civ. P. 26(e). Unlike the cases cited by the plaintiff, there is no reason to conclude that Baribault has been dishonest or otherwise skirted her discovery responsibilities. As set forth above, after conducting an evidentiary hearing on April 1, 2024, which was after the plaintiff received some of the photographs he referenced during the October 9, 2024 oral argument on this motion, the Court specifically credited Baribault's testimony that she made diligent efforts to replevy all of the historic items. There is no reason to conclude she is in possession of fixtures that she already declared she does not possess. And there is no reason to conclude that an inspection would lead to discoverable evidence. Even if the plaintiff were to enter, inspect, and discover items that have not yet been replevied, he still would not be able to answer the central question: whether the items were taken *after* Baribault no longer owned the home. Indeed, the more appropriate discovery approach—which he has already taken—is to answer this question through deposition testimony and written discovery requests. At this late stage in litigation, the instant request is simply not proportional.

**C.     Plaintiff's Motion to Compel Compliance with Third-Party Subpoenas (Doc. No. 194)**

The plaintiff moves to compel Citizens' compliance with a document-preservation subpoena and a subpoena *duces tecum* served on May 23, 2024. (Doc. No. 194; Doc. No. 181-3 (Subpoena)). The plaintiff requested production of five types of materials: (1) e-mails and attachments between Baribault and various individuals and e-mail addresses from November 1,

2006 to the present; (2) e-mails and attachments between the defendants from January 1, 2018, to March 2019; (3) Baribault's e-mails from November 1, 2006 to March 22, 2019, that contain the word, "Canterbury"; (4) photographs and videos on any of Baribault's Citizens-issued devices; and (5) documents and communications that contain the word, "Canterbury," on any of Baribault's Citizens-issued devices. (Doc. No. 181-3). The plaintiff argues that the discovery may establish what fixtures were removed and when they were removed. (Doc. No. 194-1 at 6). He also contends that the subject communications may establish the defendants' state of mind, which is relevant to his statutory theft claim. (*Id.* at 7). The plaintiff states that Citizens possesses the sought-after ESI, Citizens waived its objections, Baribault's misconduct and Citizens' failures to preserve documents warrant a forensic examination, and Citizens should bear the cost of such examination. (*See id.* at 8–10, 12).

Citizens opposes the motion. First, Citizens argues that it does not possess responsive documents. (Doc No. 213 at 7). Second, it contends the document-preservation subpoena exceeds the scope of permitted discovery and is disproportionate to the needs of the case. (*Id.* at 8). Third, Citizens posits a forensic examination of its electronic devices is unwarranted. (*Id.* at 13). Fourth, Citizens states that document-preservation subpoenas are not recognized in this district. (*Id.* at 16). Finally, Citizens requests the plaintiff reimburse it for the cost to litigate this motion. (*Id.* at 17).

During the October 9, 2024 oral argument, the Court first questioned Citizens and then turned to the plaintiff. Counsel for Citizens represented that the employer produced some responsive e-mails but, apparently dissatisfied with the production, the plaintiff pressed Citizens to produce additional data. When asked whether the plaintiff engaged in a meaningful meet and confer, Citizens indicated that they exchanged e-mails but did not have a phone call or meet in

40

person.  The Court then asked the plaintiff why he was entitled to obtain the requested documents from Baribault's employer in a case that was wholly unrelated to her employment.  The plaintiff explained that he was not able to obtain documents responsive to his April 2023 discovery requests served on Baribault.  When asked why the subpoena to Citizens was so broad in that it sought documents dating back to 2006 and documents with the word "Canterbury," the plaintiff indicated that this was his first time litigating and that he believed a broad request would make it easier for Citizens to comply.[19]

In his reply filed October 16, 2024, the plaintiff lodges several arguments.  (*See* Doc. No. 236).  First, the plaintiff disagrees with the notion that Citizens does not possess documents, reasoning that its "esoteric process whereby the devices are 'assigned' to each branch" does not absolve it from producing responsive documents.  (*Id.* at 1).  Second, the plaintiff argues that the subpoena is the least intrusive and burdensome way to obtain Citizens' documents, stating, without citing evidence, that "Baribault wilfully refused to search for and produce the requested ESI, and, therefore, she cannot be trusted to search for and produce ESI contained on any of the devices that she uses, including her work computer."  (*Id.* at 2).  He presumes (without explaining) that he is entitled to Citizens' documents.  Third, the plaintiff contends that the discovery sought is proportional because he only wants Citizens to search one computer and that Citizens' IT department could simply parse out and produce the documents that are not related to Citizens' business.  (*Id.* at 2–4).  With respect to Citizens' concern for its clients' financial data, the plaintiff states, "Although data security is undoubtedly a legitimate concern, Citizens provides no evidence whatsoever regarding the nature or extent of the risk that a forensic examination would involve."

---

[19] Though the plaintiff is an attorney who is barred in Connecticut, the Court has treated him as a "self-represented" litigant. (Doc. Nos. 175 and 229).

(*Id.* at 4).   Fourth, the plaintiff challenges Citizens' contention that a forensics examination is unwarranted in this case.  (*Id.* at 6–7).  Lastly, the plaintiff argues that the subpoena is enforceable. (*Id.* at 7).

At oral argument, the Court had specifically requested that the plaintiff address the broad scope of the subpoena in his reply.  The plaintiff's reply states: "The short answer is that the plaintiff is undoubtedly entitled to the information that he requested from Baribault in his April, 2023 Requests and that a broadly framed subpoena duces tecum directed to Citizens is the only practical means of obtaining any such information that Baribault may have stored on her work computer." (*Id.* at 8).   He posits that narrowing his subpoena to the April 2023 discovery request topics "would be extremely difficult, if not impossible, for Citizens to distinguish between responsive and nonresponsive information because Citizens lacks sufficient knowledge regarding the subject matter in this action." (*Id.*).  The plaintiff maintains that a court is obligated to modify, rather than quash, a subpoena if a modification can rectify the deficiency.  (*Id.* at 9).

While the permissible scope of discovery from a non-party is typically the same as that for a party, the burden of discovery sought must be balanced against the need for the requested information. *Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 92 (D. Conn. 2012) (citing *Wells Fargo Bank, N.A. v. Konover*, No. 3:05CV1924 (CFD)(WIG), 2009 WL 585434, at *5 (D. Conn. Mar. 4, 2009) (applying balancing test of Rule 26(b)(2)(C) to deny in part plaintiff's Rule 45 motion to compel production of documents from non-party)). When the non-party is an employer, "courts within the Second Circuit have recognized, . . . [b]ecause of the direct negative effect that disclosures of disputes with past employers can have on present employment, subpoenas in this context, if warranted at all, should be used only as a last resort." *Moll*, 2016 WL 6093995, at *3

(internal citations removed); *Warnke v. CVS Corp.*, 265 F.R.D. 64, 69 (E.D.N.Y. 2010) (collecting cases).

For substantially the same reasons as those set forth above in the Court's ruling denying the other two motions to compel, and as further discussed during the discovery hearing, the Court concludes that this motion must be denied.  Citizens has already attempted to respond to the subpoena, despite its broad scope, and that response will suffice. The relative need for the requested documents is low given the plaintiff has already served substantially similar discovery requests on the defendants.  Indeed, the plaintiff has made clear that the information he seeks overlaps with the discovery requests he served on Baribault in April 2023.  (*See* Doc. No. 194-1 at 5–6 ("For purposes of this motion, however, the subpoena should be construed as coextensive with the April, 2023 Requests, which are undoubtedly relevant to the plaintiff's claims and some of the defendants' affirmative defenses.")).  This means that he has obtained the discovery he currently seeks.  His disappointment with Baribault's discovery responses does not mean that he is entitled to obtain documents from her employer—a federally regulated bank subject to strict customer confidentiality requirements—through an extraordinarily broad subpoena that is practically unlimited by topic and/or covers a thirteen year period.  Indeed, he has presented no persuasive evidence establishing that an employer-issued subpoena in a *non-employment case* is warranted.  *See Moll*, 2016 WL 6093995, at *3.  In other words, this motion is even less persuasive than the two that precede it.[20]

---

[20] While Citizens did not formally move for sanctions, it raised concerns about the plaintiff's overuse of the subpoena power.  (*See* Doc. No. 213).  The Court ordered the plaintiff to respond to this issue in his reply.  In summary, the plaintiff argues that sanctions are not warranted because Citizens did not submit any evidence supporting their contention, and the plaintiff lodged a broad request "to make it as easy as possible for Citizens to identify and produce responsive materials."  (Doc. No. 236 at 10).

While the Court is troubled by the plaintiff's extraordinarily broad, scorched-earth discovery tactics that clearly go beyond Rule 26(b) *and* his refusal to negotiate in good faith with his adversaries, the Court will not issue sanctions at this time given the plaintiff's status as a self-represented litigant.  The Court reminds

IV.   <u>**CONCLUSION**</u>

For the aforementioned reasons, the Court **DENIES** the plaintiff's Motion to Compel Entry onto Land & Production of Tangible Things (Doc. No. 182) and Motion to Compel Compliance with Subpoenas Directed to Citizens Bank, N.A. (Doc. No. 194) in their entirety.   The Court **GRANTS IN PART** and **DENIES IN PART** the plaintiff's Motion to Compel Forensic Examination (Doc. No. 181)—specifically, the Motion is **DENIED** in its entirety with the following exception:

- The defendants shall provide Robert Fitzpatrick with their cloud information (or assist Fitzpatrick in obtaining the information);

- Robert Fitzpatrick shall conduct a forensic examination for cloud data between December 12, 2018 and March 22, 2019, using the same methods set forth in his declaration.   The defendants shall assess the data collected in this forensic examination  and produce the following, if it exists:

  o   The defendants shall produce discovery responsive to Requests One through Five and Eleven, limited by the date range ordered by this Court;

  o   For Requests Three, Four, and Five, Fitzpatrick shall use the plaintiff's requested keywords (narrowed by the limited time period).

- The parties shall split the cost of this forensics examination.

---

the plaintiff that, should he choose to bring actions in this jurisdiction on behalf of clients he represents, he must abide by his ethical duties as an officer of the court.   *Preamble: A Lawyer's Responsibilities*, CONN. RULES OF PROF. CONDUCT (2024) ("A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice. . . .   A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials. . . . The legal profession's relative autonomy carries with it special responsibilities of self-government. The profession has a responsibility to assure that its regulations are conceived in the public interest and not in furtherance of parochial or self-interested concerns of the bar.").

- The examination shall be concluded no later than November 18, 2024.

The Court noticed that Document 202-1 contains information that is statutorily required to be sealed, including a party's date of birth, social security number, and bank account information. The Clerk is respectfully directed to seal Document 202-1 immediately.  The defendants are ordered to file a redacted version of Document 202-1, which redacts all dates of birth, social security numbers, bank account information, and other confidential information.  *See* Fed. R. Civ. P. 5.2; D. Conn. L. Civ R. 5(b)3.

This is not a Recommended Ruling. This Ruling is reviewable pursuant to the "clearly erroneous" statutory standard of review. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. Civ. R. 72.2. As such, it is an order of the Court unless reversed or modified by the district judge upon timely made objection.

It is so ordered this 18th day of October, 2024, at New Haven, Connecticut.

 /s/ Robert M. Spector, U.S.M.J.
ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE